UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DOIAKAH GRAY, | ) | |
| | ) | |
| Plaintiff, | ) | 11 C 4870 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| CHRIS CANNON, JOHN DOE(S), KEVIN FRAIN, | ) | |
| NANCY POUNOVICH, and MARCUS HARDY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| JOSE RODRIGUEZ, | ) | |
| | ) | |
| Plaintiff, | ) | 11 C 8503 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| CHRIS CANNON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| JOHNNIE WOODS, | ) | |
| | ) | |
| Plaintiff, | ) | 11 C 8505 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| CHRIS CANNON, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND ORDER

Doiakah Gray, Jose Rodriguez, and Johnnie Woods, three inmates at Illinois's Stateville

Correctional Center, brought these *pro se* lawsuits after Stateville officials refused to let them

receive mail that included photographs depicting nudity and sexual activity.  Doc. 35 (11 C

4870) (Gray's first amended complaint); Doc. 1 (11 C 8503) (Rodriguez's complaint); Doc. 1 (11 C 8505) (Woods's complaint). The suits are materially identical and will be discussed together. Plaintiffs advance two claims under 42 U.S.C. § 1983: (1) that Defendants' refusal to give them the materials violates the Free Speech Clause of the First Amendment; and (2) that the grievance procedures through which they were allowed to challenge the refusals violate the Due Process Clause of the Fourteenth Amendment. Doc. 35 (11 C 4870) at ¶¶ 31-34; Doc. 1 (11 C 8503) at ¶¶ 20-25; Doc. 1 (11 C 8505) at ¶¶ 20-25.

Defendants have moved for summary judgment in all three cases. Doc. 83 (11 C 4870); Doc. 20 (11 C 8503); Doc. 19 (11 C 8505). Gray also moved for summary judgment. Doc. 77 (11 C 4870). Defendants' motions are granted and Gray's motion is denied.

## Background

In considering Defendants' summary judgment motions, the court must take the facts as favorably to Plaintiffs as the record and Local Rule 56.1 allow. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). Because Defendants will be granted summary judgment, it is unnecessary to separately consider Gray's motion—its denial follows necessarily from the grant of Defendants' motions. *See Continental Datalabel, Inc. v. Avery Dennison Corp.*, 2012 WL 5467667, at *14 (N.D. Ill. Nov. 9, 2012) (granting the defendant's summary judgment motion and concluding that "[i]t necessarily follows that [the plaintiff's] cross-motion for summary judgment on liability … is denied").

Defendants are current or former Stateville employees. Chris Cannon is the former Publications Review Chairman at Stateville. Doc. 94 (11 C 4870) at ¶ 6. In that capacity, Cannon reviewed publications mailed to Stateville inmates and determined whether they should be given to their addressees or rejected as contraband. *Ibid*. Kevin Frain is Stateville's current

Publications Review Chairman.  *Id*. at ¶ 3.  Nancy Pounovich (whose name is spelled

"Pounvovich" in some filings) is a superintendent at Stateville whose duties include oversight of

Stateville's mailroom.  *Id* at ¶ 4.  Marcus Hardy is Stateville's warden.  *Id*. at ¶ 5.

The Illinois regulation governing prisoners' access to publications is 20 Ill. Admin. Code

525.230 ("Procedure for Review of Publications").  Section 525.230 establishes the position of

Publication Review Officer and provides that such officers "shall review publications to

determine whether to recommend prohibiting acceptance of any publications that he or she finds

to contain material determined to be: 1) Obscene; [or] 2) Detrimental to security, good order,

rehabilitation, or discipline or if it might facilitate criminal activity, or be detrimental to mental

health needs of an offender as determined by a mental health professional."  *Id*. § 525.230(a).

"A publication may not be rejected solely because its content is … sexual or because its contents

are unpopular or repugnant," but a publication may be rejected if any portion "is obscene" or if

"[i]t includes sexually explicit material that by its nature or content poses a threat to security,

good order, or discipline or if it facilitates criminal activity."  *Id*. § 525.230(b)(1), (b)(6).  The

regulation provides that an inmate whose publication is under review shall have an opportunity

to object to its being disapproved and to submit a statement in support of the publication.  *Id*.

§ 525.230(c).  If the Publication Review Officer decides that the publication should be

disapproved, he recommends disapproval to a Chief Administrative Officer (the "highest ranking

official" at the prison, *see id*. § 504.12), and the publication is disapproved only if the Chief

Administrative Officer concurs with the Publication Review Officer's recommendation.  *Id*.

§ 525.230(d).  The regulation also provides that "[i]f after six consecutive issues of a publication

have been denied and it is determined unlikely that future issues of the publication will be

approved, the publication may be banned," but that "[i]f the characteristic content of a banned

publication significantly changes to no longer warrant denial," an inmate may request a new review of the publication. *Id*. § 525.230(f), (g).

The Illinois Department of Corrections implemented § 525.230 with Administrative Directive 04.01.108. Doc. 85-1 (11 C 4870) at 56-62. Paragraph II.F.3 of the directive provides: "Publications that have been redacted, altered, or otherwise modified from the original published edition are prohibited and shall not be accepted for assessment or review." *Id*. at 57. Stateville has promulgated Warden's Bulletin #2011-93, which states that "Nude Photos or prints," along with other items, "will not be allowed through the mailroom." Doc. 35 (11 C 4870) at p. 53.

After review by the Publication Review Officer, publications are placed on the Approved Publication List, the Conditionally Approved Publication List, or the Disapproved Publication List. Doc. 94 (11 C 4870) at ¶ 14. Disapproved publications are disposed of as contraband. *Id*. at ¶ 15. An inmate who disagrees with the disapproval of a publication may file a grievance pursuant to 20 Ill. Admin. Code 504 and Administrative Directives 04.01.114 and 04.01.115. Doc. 85-1 (11 C 4870) at 58. Section 504.810 provides that an inmate first should present his complaint to his counselor and, if that does not resolve the problem, should submit a written grievance to a Grievance Officer. *Id*. § 504.810(a), (b). The Grievance Officer then makes a recommendation to the Chief Administrative Officer, who makes a decision and advises the inmate of the decision in writing. *Id*. § 504.830(d). If the inmate remains unsatisfied, he may appeal the Chief Administrative Officer's decision to the Director of the Illinois Department of Corrections, who reviews the grievance and the responses of the Grievance Officer and Chief Administrative Officer and decides whether the grievance merits a hearing before the Administrative Review Board. *Id*. § 504.850. Whether or not the Board is convened to conduct

a hearing and make a recommendation, the Director makes the final decision and sends the inmate a copy. *Id*. § 504.850(f).

Publications and photographs ordered by Plaintiffs have been withheld by Stateville officials. With respect to Gray, Stateville withheld loose photographs, issues of *Celebrity Sleuth* and *Celebrity Skin* magazines, issues of *Adam Film World Guide* and *Adam Black Video Director*, and a publication from Mailer Ad Group. Doc. 94 (11 C 4870) at ¶¶ 19, 22, 26, 28. Gray admits that "[t]hese magazines included nude photographs and photographs depicting sexual acts," adds that "[m]any photos were of nude women," and concedes that he receives the *Wall Street Journal*. *Id*. at ¶¶ 20, 31. Gray filed several grievances in response to the decisions to withhold those materials. *Id*. at ¶¶ 23, 25, 27, 29. Rodriguez subscribed to a magazine that was withheld; he admits that it contained nude photographs and "photographs depicting action scenes." Doc. 26 (11 C 8503) at ¶¶ 16-17. Rodriguez then filed several grievances. *Id*. at ¶¶ 19, 21. Woods subscribed to *Celebrity Sleuth*, *Black Tail*, and *Big Black Butt*, all of which were withheld and all of which he admits included nude and "themed" photographs. Doc. 27 (8505) at ¶¶ 16-17. Woods then filed a grievance. *Id*. at ¶ 19.

When their grievances were not resolved to their satisfaction, Plaintiffs filed these lawsuits. Defendants do not contend in their summary judgment briefs that Plaintiffs' claims are barred for failure to exhaust the administrative remedies provided by state law. *See* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 … until such administrative remedies as are available are exhausted."); *Jones v. Bock*, 549 U.S. 199, 211-12 (2007) (holding that failure to exhaust under § 1997e(a) is an affirmative defense that must be established by the defendant).

**Discussion**

As noted above, Plaintiffs claim (1) that Defendants unconstitutionally abridged their First Amendment freedom of speech by withholding the publications and photographs, and (2) that the grievance procedure fell short of the process guaranteed by the Due Process Clause of the Fourteenth Amendment. These claims are addressed in turn.

**I.      First Amendment Claim**

Plaintiffs concede that each of the photographs at issue depicts nudity, penetration, or redacted penetration. Doc. 94 (11 C 4870) at ¶ 20; Doc. 26 (11 C 8503) at ¶¶ 16-17; Doc. 27 (11 C 8505) at ¶¶ 16-17. Gray asserts that "the entire genitals at the point of contact is blacked out" in the redacted photographs, Doc. 35 (11 C 4870) at ¶ 16 n.1, but those photographs nonetheless depict sexual activity. The question presented, then, is whether prison inmates have a First Amendment right to receive photographs that depict nudity or sexual activity. They do not.

The First Amendment "embraces the right to distribute literature and necessarily protects the right to receive it." *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943) (citation omitted). Moreover, "sexual expression which is indecent but not obscene is protected by the First Amendment." *Reno v. ACLU*, 521 U.S. 844, 854 (1997) (brackets and internal quotation marks omitted). Defendants do not argue that the materials at issue here are "obscene" within the meaning of *Miller v. California*, 413 U.S. 15 (1973), and so the court assumes that they would be protected by the First Amendment outside the prison context.

"[F]ederal courts must take cognizance of the valid constitutional claims of prison inmates. Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84 (1987) (citation omitted). That said, "[t]he fact of confinement and the needs of the penal institution impose limitations on constitutional rights,

including those derived from the First Amendment, which are implicit in incarceration." *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125 (1977). "[C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration," *Turner*, 482 U.S. at 84 (quoting *Procunier v. Martinez*, 416 U.S. 396, 406 (1974)), and "[s]ubjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration," *id*. at 89. The Supreme Court has thus "afforded considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world." *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989).

*Turner* set forth four factors to guide courts in fixing the correct balance between prisoners' constitutional rights and the need for deference to prison administrators: "(1) the validity and rationality of the connection between a legitimate and neutral government objective and the restriction; (2) whether the prison leaves open 'alternative means of exercising' the restricted right; (3) the restriction's bearing on the guards, other inmates, and the allocation of prison resources; and (4) the existence of alternatives suggesting that the prison exaggerates its concerns." *Munson v. Gaetz*, 673 F.3d 630, 633 (7th Cir. 2012) (citing *Turner*, 482 U.S. at 89-91). The Supreme Court has held that "regulations affecting the sending of a 'publication' … to a prisoner must be analyzed under the *Turner* reasonableness standard. Such regulations are 'valid if [they are] reasonably related to legitimate penological interests.'" *Abbott*, 490 U.S. at 413 (quoting *Turner*, 482 U.S. at 89) (alteration in original); *see also Munson*, 673 F.3d at 636 ("The challenged regulation survives if it bears a rational relation to legitimate penological

interests."). "The burden … is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

The Supreme Court has not addressed prison restrictions on nude or sexual photographs, and the Seventh Circuit has not done so in a published opinion since *Trapnell v. Riggsby*, 622 F.2d 290 (7th Cir. 1980). (*Bullock v. McGinnis*, 1993 WL 533325 (7th Cir. Dec. 21, 1993), and *Smith v. Donohue*, 1992 WL 238340 (7th Cir. Sept. 24, 1992), are unpublished orders issued before January 1, 2007, and thus are not discussed. *See* 7th Cir R. 32.1(d).) *Trapnell* upheld against a First Amendment challenge a prison rule that banned prisoners from receiving nude photographs that had not been commercially published. *Id*. at 293-94. The rule distinguished published photographs like some of the photographs in this case from unpublished, non-commercial photographs. *Id*. at 292. Inmates were barred from receiving only the latter—indeed, the prison made published photographs available at the prison commissary and screened sexually explicit films for the prisoners. *Id*. at 293.

*Trapnell* provides little guidance to the present cases, which concern a broad restriction on both commercial and non-commercial photographs. *Trapnell* dealt with a narrow ban on non-commercial nude photographs, and its analysis relies on the narrowness of the ban and its particular rationale—namely, that non-commercial photographs are often of "inmate wives and girlfriends posing for one particular inmate," and that "[i]f such photographs were viewed by other inmates, conflicts or assaults are likely to result." *Id*. at 292. Still, *Trapnell* does not hold that prisoners *do* have a First Amendment right to receive commercial nude or sexually explicit photographs; that question was not before the court. *Cf. Nw. Nat'l Ins. Co. v. Maggio*, 976 F.2d 320, 323 (7th Cir. 1992) ("Judicial opinions are frequently drafted in haste, with imperfect foresight, and without due regard for the possibility that words or phrases or sentences may be

8

taken out of context and treated as doctrines. … No court … is obliged to treat … its own dicta … as binding precedent."). Moreover, *Trapnell*'s analysis is based on the pre-*Turner* precedent of *Procunier v. Martinez*, *supra*, which now applies only to regulations on *outgoing* correspondence from prisoners, *see Abbott*, 490 U.S. at 413-14 ("the logic of our analyses in *Martinez* and *Turner* requires that *Martinez* be limited to regulations concerning outgoing correspondence"), with *incoming* materials governed by *Turner*. As the Supreme Court has recognized, *Martinez* provides a "less deferential approach" than the now-applicable *Turner* standard, *id.* at 409, meaning that a prison regulation on incoming materials that would have been unconstitutional under *Martinez* could nonetheless be permissible under *Turner*.

In the years since the Supreme Court established *Turner* as the controlling standard for incoming materials, at least four federal appeals courts have considered First Amendment challenges to prison bans on the receipt by prisoners of nude or sexually explicit photographs, and each has upheld the bans. *See Jones v. Salt Lake Cnty.*, 503 F.3d 1147, 1154-56 (10th Cir. 2007) (upholding a prison ban on "sexually explicit" publications, meaning publications featuring pictures of "breasts and genitals"); *Mauro v. Arpaio*, 188 F.3d 1054, 1057-63 (9th Cir. 1999) (en banc) (upholding a prison ban on "sexually explicit materials," defined as "materials that show frontal nudity," including "personal photographs, drawings, and magazines and pictorials that show frontal nudity"); *Amatel v. Reno*, 156 F.3d 192, 194 (D.C. Cir. 1998) (upholding federal regulations implementing the Ensign Amendment, which barred "the use of Bureau of Prisons funds to pay for the distribution of commercial material that 'is sexually explicit or features nudity,'" with "nudity" defined as "a pictorial depiction where genitalia or female breasts are exposed" and "sexually explicit" defined as "a pictorial depiction of actual or simulated sexual acts including sexual intercourse, oral sex, or masturbation"); *Owen v. Wille*,

117 F.3d 1235, 1238 (11th Cir. 1997) (upholding a prison's withholding of nude photographs where, "in practice, each publication sent to a prisoner is reviewed by at least three prison officials before it is rejected"); *see also Waterman v. Farmer*, 183 F.3d 208, 209-10 (3d Cir. 1999) (Alito, J.) (upholding a statute banning "sexually oriented and obscene materials" from a correctional facility operated "for the sole purpose of housing and rehabilitating sex offenders").

There is no basis to conclude that the Seventh Circuit would reach a result different from those reached by these four circuits; to the contrary, there is every reason to believe that the Seventh Circuit would reach the same result. The Seventh Circuit has held that "[p]risons have great latitude in limiting the reading material of prisoners." *Mays v. Springborn*, 575 F.3d 643, 649 (7th Cir. 2009). And the Supreme Court and the Seventh Circuit have upheld prison restrictions on content that, outside the prison context, would be protected by the First Amendment. *See Abbott*, 490 U.S. at 403-04 (upholding against a facial challenge a prison regulation broadly authorizing officials "to reject incoming publications found to be detrimental to institutional security"); *Turner*, 482 U.S. at 81 (upholding a prison regulation banning most correspondence between inmates at different prisons); *Toston v. Thurmer*, 689 F.3d 828, 829 (7th Cir. 2012) (upholding a prison's confiscation of an inmate's copy of the Black Panthers' "Ten-Point Program" as "gang literature"); *Munson*, 673 F.3d at 631-32 (upholding a prison's prohibition on a prisoner's possessing medical books "because of their drug-related content," *id*. at 634); *Van den Bosch v. Raemisch*, 658 F.3d 778, 788 (7th Cir. 2011) (upholding a prison's prohibition of *The New Abolitionist* newsletter on the ground that it "may reasonably encourage distrust of prison staff and threaten prison security"); *Singer v. Raemisch*, 593 F.3d 529, 531, 535 (7th Cir. 2010) (upholding a prison's ban on the "popular role-playing game Dungeons and Dragons" as "a threat to prison security" on the ground that gameplay "mimics the organization

of a gang" and promotes an "obsession with escaping from the real life, correctional environment"); *Mays*, 575 F.3d at 649 (upholding a prison's prohibition of "an article about a prison riot and images of gang signs"); *Jackson v. Frank*, 509 F.3d 389, 390 (7th Cir. 2007) (upholding a prison's decision to prohibit inmates from receiving a non-nude photograph of Jennifer Aniston under a "policy that prevents inmates from possessing individual, commercially published photographs," which was enacted to spare the prison the cost of reviewing mail containing such photographs and of filtering out those containing "nudity and other forbidden content like gang symbols"); *see also Beard v. Banks*, 548 U.S. 521, 524-25, 530 (2006) (plurality opinion) (upholding a prison policy that prevented especially "dangerous and recalcitrant inmates" from receiving "newspapers, magazines, and photographs" as a means of incentivizing "better behavior on the part of particularly difficult prisoners").

This is not to say that all prison regulations that prohibit inmates from receiving and possessing particular reading materials are invariably constitutional. In *King v. Federal Bureau of Prisons*, 415 F.3d 634 (7th Cir. 2005), the Seventh Circuit reversed the district court's dismissal of an inmate's challenge to the prison's rejection of a computer programming manual:

> The refusal to allow King to obtain a book on computer programming presents a substantial First Amendment issue. Freedom of speech is not merely freedom to speak; it is also freedom to read. Forbid a person to read and you shut him out of the marketplace of ideas and opinions that it is the purpose of the free-speech clause to protect. Not that there aren't valid penological reasons for limiting prison inmates' access to certain types of book. A prison need not allow prisoners to buy books detailing famous prison escapes, or even, we suppose, books on how to make yourself as strong as Mike Tyson through exercise. Were King in prison for computer hacking or other computer-related crimes, the prison could, in the interest of rehabilitation (i.e., preventing recidivism), forbid him to buy a book that would enable him to increase his ability as a hacker when he's released. But he claims to want the book precisely for purposes of rehabilitation—to equip him to work as a programmer when he is released. That is a proper goal; whether it is his actual goal the record does not enable us to determine.

> The only reason the prison has given for not wanting King to have the book he
> ordered, which teaches C//, a standard language in which computer programs
> are written, is that he might write programs with it that would disrupt the
> prison's computer system. However, computers that prisoners are permitted
> to use are not connected to the prison network, or any other network. The
> prison's lawyer speculates that King might write a program that contained a
> computer virus, put it on a diskette, and then break into a room in which there
> is a computer used by prison employees and connected to the prison network,
> insert the diskette, and infect the network. This seems far-fetched but in any
> event, as an argument found only in the government's brief, does not defeat
> King's claim. He has made a prima facie claim of infringement of his
> freedom of speech, and the government must present some evidence to show
> that the restriction is justified by the need to protect the prison's computer
> system.

*Id.* at 638-39 (citations omitted). The present cases have far more in common with the cases

where courts have upheld challenged regulations than with *King*. And given the guidance

provided by the Supreme Court and the Seventh Circuit, the court agrees with the appeals courts

that have held, unanimously, that prisons may prohibit inmates from receiving nude or sexually

explicit photographs.

The court's independent application of the four *Turner* factors reinforces this conclusion.

The first factor looks to "the validity and rationality of the connection between a legitimate and

neutral government objective and the restriction." *Munson*, 673 F.3d at 633. Prison security is

the government objective asserted by Defendants. Defendants maintain that this objective is

served by the above-cited regulation, which permits prison officials to reject a publication on the

ground that "[i]t includes sexually explicit material *that by its nature or content poses a threat to

security, good order, or discipline*." 20 Ill. Admin. Code 525.230(b)(6) (emphasis added).

The Supreme Court has held with respect to the first *Turner* factor that "a regulation

cannot be sustained where the logical connection between the regulation and the asserted goal is

so remote as to render the policy arbitrary or irrational. Moreover, the governmental objective

must be a legitimate and neutral one. [The Court has] found it important to inquire whether

prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, without regard to the content of the expression." *Turner*, 482 U.S. at 89-90. Accordingly, as the Seventh Circuit has explained, analysis under this factor requires consideration of "whether the governmental objective underlying the policy is (1) legitimate, (2) neutral, and (3) whether the policy is rationally related to that objective." *Mauro*, 188 F.3d at 1059 (internal quotation marks omitted).

As to first consideration, "[t]he legitimacy of the Government's purpose in promulgating these regulations is beyond question. The regulations are expressly aimed at protecting prison security, a purpose [the Supreme] Court has said is 'central to all other corrections goals.'" *Abbott*, 490 U.S. at 415 (quoting *Pell v. Procunier*, 417 U.S. 817, 823 (1974)). As to the second consideration, neutrality, it must be acknowledged that § 525.230(b)(6) does not operate entirely "without regard to the content of the expression." *Turner*, 482 U.S. at 90. But the same was true in *Abbott*, and the Supreme Court explained there that "the … reference to 'neutrality' in *Turner* was intended to go no further than [the] requirement … that the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression." 490 U.S. at 415 (internal quotation marks omitted). That is true here, as the regulation permits withholding reading materials not for the purpose of suppressing speech, but only if it furthers interests in "security, good order, or discipline." 20 Ill. Admin. Code 525.230(b)(6). "Where, as here, prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security, the regulations are 'neutral' in the technical sense in which [the Court] meant and used that term in *Turner*." *Abbott*, 490 U.S. at 415-16.

As to the third consideration relevant to the first *Turner* factor, "whether the policy is rationally related to that objective," *Mauro*, 188 F.3d at 1059 (internal quotation marks omitted), there exists a valid and rational connection between the regulation and prison security. The regulation is precisely worded to condition rejection on a prison official's determination that the material at issue "poses a threat to security, good order, or discipline." 20 Ill. Admin. Code 525.230(b)(6). *Abbott* said that "it is rational for the Bureau [of Prisons] to exclude materials that, although not necessarily 'likely' to lead to violence, are determined by the warden to create an intolerable risk of disorder under the conditions of a particular prison at a particular time." 490 U.S. at 417. That is the case here. True, the broadly worded criteria of the regulation— "sexually explicit material that by its nature or content poses a threat to security, good order, or discipline"—allow prison officials to exercise substantial discretion in considering any given item. But the Supreme Court has held that "[w]here the regulations at issue concern the entry of materials into the prison, … a regulation which gives prison authorities broad discretion is appropriate." *Id*. at 416.

The second *Turner* factor is "whether the prison leaves open alternative means of exercising the restricted right." *Munson*, 673 F.3d at 633 (internal quotation marks omitted). *Abbott* emphasized that "'the right' in question must be viewed sensibly and expansively," and that "it [is] sufficient if other means of expression … remain[] available." 490 U.S. at 417-18. Consistent with those admonitions, *Abbott* held that the challenged regulations in that case, which "authorize[d] prison officials to reject incoming publications found to be detrimental to institutional security," *id*. at 403, satisfied the second *Turner* factor because they "permit[ted] a broad range of publications to be sent, received, and read," *id*. at 418.

Viewed "expansively," the right at issue here is Plaintiffs' First Amendment right to receive and read a range of publications so that they are not "shut … out of the marketplace of ideas and opinions that it is the purpose of the free-speech clause to protect." *King*, 415 F.3d at 638. There is no dispute that Plaintiffs are permitted to receive a wide range of publications. Doc. 94 (11 C 4870) at ¶ 31. Gray, for instance, receives *The Wall Street Journal*, *ibid*., and while he may consider it an inadequate substitute for *Celebrity Sleuth* and *Celebrity Skin*, it certainly constitutes an alternative means of exercising his First Amendment rights. "The[] alternatives need not be ideal to [the plaintiff] for them to adequately satisfy the concerns raised by the second *Turner* factor." *Singer*, 593 F.3d at 539.

The third *Turner* factor requires consideration of "the restriction's bearing on the guards, other inmates, and the allocation of prison resources." *Munson*, 673 F.3d at 633. The Supreme Court's analysis of the challenged restrictions in *Abbott* applies with equal force here:

> [T]he class of publication to be excluded is limited to those found potentially detrimental to order and security; the likelihood that such material will circulate within the prison raises the prospect of precisely the kind of "ripple effect" with which the Court in *Turner* was concerned. Where, as here, the right in question can be exercised only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike, the courts should defer to the informed discretion of corrections officials.

490 U.S. at 418 (citations and internal quotation marks omitted). It may not be inevitable that sexually explicit materials create such risks; recall that the prison in *Trapnell* banned non-commercial nude photographs but sold commercial pornography at its commissary and screened sexually explicit films for the prisoners. 622 F.2d at 293. Nonetheless, "[n]ot being experts in prison administration, but aware of the security problems in American prisons, judges sensibly defer within broad limits to the judgments of prison administrators." *Toston*, 689 F.3d at 830. As every federal appeals court to have considered prison restrictions on nude or sexually explicit

photographs since *Turner* has concluded, such restrictions fall with the "broad limits" of appropriate deference.

The fourth *Turner* factor looks to "the existence of alternatives suggesting that the prison exaggerates its concerns." *Munson*, 673 F.3d at 633. "[I]f an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Turner*, 482 U.S. at 91. "The burden is on the prisoner challenging the regulation, not on the prison officials, to show that there are obvious, easy alternatives to the regulation." *Mauro*, 188 F.3d at 1062; *see also O'Lone v. Estate of Shabazz*, 482 U.S. 342, 350 (1987) ("By placing the burden on prison officials to disprove the availability of alternatives, the approach articulated by the Court of Appeals fails to reflect the respect and deference that the United States Constitution allows for the judgment of prison administrators."). Plaintiffs have suggested no such alternative.

Accordingly, based on an independent application of the *Turner* factors, the court concludes that a prison regulation preventing inmates from obtaining nude or sexually explicit photographs is constitutional under *Turner*'s reasonableness standard. And because there is no dispute that all of the materials at issue here depict nudity or sexual activity, Defendants' rejections of those materials are permissible under the First Amendment. Plaintiffs advance several arguments to the contrary, which are addressed in turn.

First, citing *Abbott*, Plaintiffs argue that "Cannon's denial and enforcement of a blanket ban on the publication *Celebrity Sleuth*" was unconstitutional because "[t]here must be an 'individualized' determination that a particular publication violates the rules at the time it is censored. The prison cannot simply establish an 'excluded list' of publications or ban broad

categories of materials without regard to their actual contents." Doc. 95 (11 C 4870) at 4; *see also* Doc. 28 (11 C 8503) at 3-5; Doc. 26 (11 C 8505) at 3-4. The Supreme Court in *Abbott* said that it was "comforted by the individualized nature of the determinations required by the regulation." 490 U.S. at 416. It does not follow that the First Amendment *requires* that prisons closely inspect every individual publication to determine whether it poses a threat to prison security. To the contrary, it is constitutionally permissible for a prison to determine that a certain class of publications or similar items ought to be subjected to what Gray calls a "blanket ban," as Defendants did when they placed *Celebrity Sleuth* on the "disapproved list" and proceeded to reject each new issue without an individualized inspection.

This conclusion finds support in *Jackson v. Frank*, *supra*, where the Seventh Circuit upheld a categorical ban on all stand-alone, commercially published photographs, even as applied to a non-sexual photograph of Jennifer Aniston. The Seventh Circuit upheld the ban on the ground that it would have been costly for the prison to inspect every incoming photograph to make an individualized determination of whether it contained "nudity and other forbidden content like gang symbols." 509 F.3d at 390. Gray's position is weaker than that of the *Jackson* plaintiff, since the Aniston photograph in *Jackson* did not itself appear to pose any threat to prison security, and that photograph's rejection was upheld on efficiency grounds. Unlike the *Jackson* plaintiff, Gray demands access to photographs that actually depict nudity and sexual content. Defendants were on firm First Amendment ground in rejecting such materials.

Plaintiffs also cite *Pepperling v. Crist*, 678 F.2d 787, 790 (9th Cir. 1982), which invalidated as overbroad a prison's "prohibition on prisoners' receipt of nude pictures of wives and girlfriends, and … on receipt of certain publications, specifically Hustler and High Times," and *Guajardo v. Estelle*, 580 F.2d 748, 762 (5th Cir. 1978), which held that "[b]efore delivery of

a publication may be refused, prison administrators must review the particular issue of the publication in question and make a specific, factual determination that the publication is detrimental to prisoner rehabilitation because it would encourage deviate, criminal sexual behavior." Doc. 95 (11 C 4870) at 4-5. But those decisions were made on the authority of *Martinez*, which as noted above was overruled as applied to incoming mail and replaced by the more deferential *Turner* standard. Finally, Gray quotes *Owen v. Wille*, *supra*, where the Eleventh Circuit said that "[d]efense counsel does not contest that a blanket ban on nude photographs would be unconstitutional," and noted that "[a]t oral argument, defense counsel was asked, 'You agree that a blanket prohibition against nude photographs would be unconstitutional?' to which counsel responded, 'Facility-wide, yes.'" 117 F.3d at 1237, 1237 n.4. Because the policy at issue in *Owen*, which the Eleventh Circuit upheld, was not a blanket ban, the quoted statements are dicta.

Second, Gray complains that Cannon told him that he would be permitted to receive publications that included redacted photographs but then, when the publications arrived, withheld them. Doc. 95 (11 C 4870) at 6-7. As explained above, Cannon was entitled as a First Amendment matter to withhold publications that included photographic depictions of sexual activity, even if "[t]he entire genitals at the point of contact is blacked out." Doc. 35 (11 C 4870) at ¶ 16 n.1. If Cannon misled Gray, Gray's remedy, if any, does not come under the First Amendment. At any rate, although Gray's brief asserts that Cannon told him he would be allowed to receive the redacted publications, that assertion is not supported by anything in the parties' Local Rule 56.1 statements. "Under settled law, facts asserted in a brief but not presented in a Local Rule 56.1 statement are disregarded in resolving a summary judgment motion." *Beard v. Don McCue Chevrolet, Inc.*, 2012 WL 2930121, at *5 (N.D. Ill. July 18,

2012) (internal quotation marks omitted); *see also Midwest Imps., Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995) (holding that the predecessor to Local Rule 56.1(b)(3) "provides the only acceptable means of … presenting additional facts to the district court").  Gray's argument fails on this ground as well.

Third, Gray contends that the redacted photographs did not actually violate Administrative Directive 04.01.108's ban on "[p]ublications that have been redacted, altered, or otherwise modified from the original published edition."  Doc. 85-1 (11 C 4870) at 57; *see also* Doc. 95 (11 C 4870) at 7.  His argument is that, although the photographs were "redacted," they were not "redacted, altered, or otherwise modified from the original published edition" within the meaning of the administrative directive because they had been redacted by the publisher itself.  Doc. 94 (11 C 4870) at ¶ 24.  This argument fails.  Because the photographs concededly depicted sexual activity, Gray had no First Amendment right to receive them.  Whether Defendants properly interpreted the administrative directive has no bearing here because this is a § 1983 suit, and § 1983 does not does not provide a remedy for a government official's alleged violation of state law.  *See Archie v. City of Racine*, 847 F.2d 1211, 1217 (7th Cir. 1988) (en banc) ("A state ought to follow its law, but to treat a violation of state law as a violation of the Constitution is to make the federal government the enforcer of state law.  State rather than federal courts are the appropriate institutions to enforce state rules."); *see also Idris v. City of Chicago*, 552 F.3d 564, 567 (7th Cir. 2009) ("The Constitution does not demand that units of state government follow state law.  A federal court assumes that the action is authorized as a matter of local law and asks only whether federal law forbids what the city or state has done.  Whether state law permits that action in the first place is a question for state courts, under their own law.") (citations omitted); *Trudell v. Brown*, 250 F. App'x 182, 183 (7th Cir. 2007)

("federal courts do not apply state law in suits against state officials"). Gray's other state law arguments fail for the same reason. Doc. 95 (11 C 4870) at 8-9, 15-16.

Fourth, Plaintiffs complain that Cannon "failed to provide the publishers of the denied publications with notice of the denial." *Id*. at 12-13; *see also* Doc. 28 (11 C 8503) at 6-7; Doc. 26 (11 C 8505) at 7-8. Defendants Cannon and Frain concede that they failed to send rejection notifications to the publishers of *Celebrity Sleuth*, even though such notification is required by Administrative Directive 04.01.108. Doc. 95 at 30, ¶ 4 (Cannon); *id*. at 41, ¶ 5 (Frain). Plaintiffs submit that the failure was unlawful on both state law and federal constitutional grounds. Again, these § 1983 suits are the wrong vehicles to press state law challenges to Defendants' conduct.

As for the constitutional argument, Plaintiffs rely on the Supreme Court's reference in *Martinez* to the lower court's imposition of a requirement "that the author of [any letter censored by the prison] be given a reasonable opportunity to protest that decision." 416 U.S. at 418. The Supreme Court in *Martinez* "agree[d] with the District Court that the decision to censor or withhold delivery of a particular letter must be accompanied by minimum procedural safeguards," and affirmed the district court's judgment on this point. *Ibid*.; *see also Martin v. Kelley*, 803 F.2d 236, 243-44 (6th Cir. 1986) ("we hold that the mail censorship regulation is insufficient because it fails to require that notice and an opportunity to protest the decision be given to the author of the rejected letter"). Even if this portion of *Martinez* survived *Turner* and *Abbott*, the right to have the senders of rejected material informed of the rejection belongs to the senders themselves, not to the intended recipients. *See Smith v. Donohue*, No. 88-2405 (C.D. Ill. Feb. 13, 1991), *reproduced at* 1992 WL 238340 (with the relevant passage at *5 n.1), *aff'd*, 1992 WL 238340 (7th Cir. Sept. 24, 1992) (unpublished and referenced only as subsequent history).

20

"The Supreme Court has continually held that third-party standing is, on the whole, inappropriate. The exception to this rule requires a party seeking third-party standing to show, inter alia, that the possessor of the right is somehow hindered from protecting her own interests." *Kawasaki Heavy Indus., Ltd. v. Bombardier Recreational Prods., Inc.*, 660 F.3d 988, 999 (7th Cir. 2011) (citation omitted). Because there is no indication in the record that the publishers of *Celebrity Sleuth* are unable to protect their own rights, Plaintiffs lack standing to assert First Amendment rights that belong to the publishers. *See Allen v. Wright*, 468 U.S. 737, 751 (1984) ("Standing doctrine embraces several judicially self-imposed limits on the exercise of federal jurisdiction, such as the general prohibition on a litigant's raising another person's legal rights …."); *Perry v. Globe Auto Recycling, Inc.*, 227 F.3d 950, 953 (7th Cir. 2000) ("Ordinarily, of course, people have no standing to assert the rights of third parties.").

## II.  Due Process Claim

Plaintiffs also claim that, in violation of due process, they were provided with insufficient opportunities to challenge the rejections of the photographs and publications sent to them. Defendants contend that they are entitled to summary judgment because Plaintiffs were given and took the opportunity to file grievances when their materials were rejected. Doc. 84 (11 C 4870) at 7 ("Plaintiff's due process rights were protected as he was given the opportunity to appeal all of these decisions through the prison grievance procedure, which Plaintiff utilized."); Doc. 21 (11 C 8503) at 6 (same); Doc. 20 (11 C 8505) at 6 (same).

Plaintiffs indisputably were allowed to grieve the rejection decisions. They complain, however, that grievances are reviewed by the same officer who makes the initial rejection decision and that appeals from the denial of grievances are not reviewed *de novo*. According to Plaintiffs: "When the review process of the grievance goes to the second stage, the grievance

officers do not review the publications; they rely on Cannon's response [Cannon was the officer who made the initial rejection]. Finally, when the grievance is reviewed in its third stage, the final stage relies on the grievance officer's report from Cannon. Therefore, there is no appellate process to appeal the denial of publications. Once the Publication Review Chairman denies a publication, no independent second review is conducted of the denied publication. In fact, the Chairman is the only person who reviews publications. So once a publication is denied, filing a grievance for the denied publication is a façade." Doc. 28 (11 C 8503) at 5-6; *see also* Doc. 95 (11 C 4870) at 10-11 (same); Doc. 26 (11 C 8505) at 6-7 (same).

The court need not consider whether a grievance and appeal process like the one Plaintiffs describe would indeed be a "façade" that violates due process because Plaintiffs have failed to adduce record support for their account of the prison's procedures. They do not even cite evidence showing that they attempted to appeal the initial denials of their grievances. To support his account of the grievance procedures, Gray's brief cites Cannon's answers to these interrogatories:

> 6. Please state who reviewed the publication Celebrity Sleuth pursuant to Administrative Directive (H)(4)(b)(4) after the plaintiff filed a grievance requesting the publications be reviewed (See Complaint, Exhibit-A)?
>
> **ANSWER:** Chris Cannon.
>
> 7. As the publication review chairman, name any and all other prison officials at Stateville who reviewed publications after you denied a publication(s)?
>
> **ANSWER:** Unknown to this Defendant.

Doc. 95 (11 C 4870) at 11 (citing *id*. at 30). That Cannon could not name any other prison official who reviewed the publications does not mean that Gray appealed Cannon's denials or that the person(s) who decided the appeals did not independently review the rejected publications. In his Local Rule 56.1(b)(3)(C) statement, Gray asserts: "The defendants … do not

afford the plaintiff an opportunity to have a denied publication reviewed by a prison official or third party once the publication is denied and appealed by the plaintiff. (See Plaintiff's Memorandum of Law In Support of His Motion to Deny Defendants' Motion for Summary Judgment, Exhibit B, paragraphs 6-7; Exhibit E, paragraph 8.)" Doc. 94 (11 C 4870) at 11-12, ¶ 4. To support this assertion, Gray cites only the above-quoted interrogatory answers from Cannon and the following interrogatory answer from Frain:

> 8. Please state the name(s) of the person(s) who reviews a publication once it has been denied and the plaintiff appeals the denial?
>
> **ANSWER:** When my review of a publication reveals that it is not allowed I send the inmate a "Disposal of Denied Publication" form (DOC 0213), telling him why he will not be allowed to receive the item(s). The inmate then has 30 days to inform me what he would like me to do with the item(s). After 30 days, the item(s) is destroyed unless indicated by the inmate, on the DOC 0213 form, that he is filing a grievance. The item is then stored until I am informed by the grievance office, ARB or the Publication Review Board of the decision concerning the inmate's grievance.

Doc. 95 (11 C 4870) at 42. Frain's answer says nothing about whether prison officials considering grievances conduct an independent review of the rejected publication or merely defer to the publication officer's initial decision, or whether officials considering appeals of grievance denials conduct an independent review or merely defer to the grievance officer's decision.

Rodriguez's brief cites a letter sent to him by the Administrative Review Board Office of Inmate Issues. Doc. 28 (11 C 8503) at 5-6 (citing *id*. at 23). That letter, which affirms the rejection of an issue of *Celebrity Sleuth* that Rodriguez had ordered, does not say that the reviewing officer failed to independently review the issue in question. Rodriguez also cites the above-quoted interrogatory responses from Cannon. *Id*. at 6 (citing *id*. at 10). As shown above, those responses do not support Plaintiffs' assertions about Stateville's grievance and appeal

procedures.  In his Local Rule 56.1(b)(3)(C) statement, Rodriguez asserts that "[d]enied publications are not reviewed by a third party (See Plaintiff's memorandum of Law, Exhibit A, paragraphs 6, 7)."  Doc. 26 (11 C 8503) at 6, ¶ 4.  The cited materials are the same Cannon interrogatory responses discussed above.  Woods, too, cites only those interrogatory responses to support his description of the prison's procedures.  Doc. 26 (11 C 8505) at 7 (citing *id*. at 12); Doc. 27 (11 C 8505) at 7, ¶ 4.

Because Plaintiffs have failed to provide record support for their assertions about how Stateville's grievance and appeal procedures operate, the court need not consider whether Stateville's procedures would violate due process if they operated in the manner that Plaintiffs claim—that is, if the upper levels of review more or less rubber-stamp the initial rejection rather than review the rejected publication themselves.  *See FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 632 (7th Cir. 2005) (affirming the grant of summary judgment due to the non-movant's failure to adduce evidence raising a material factual dispute); *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994) (same).

Gray also complains that Defendants failed to inform him of the grounds for rejecting several of the publications he ordered.  Doc. 94 (11 C 4870) at ¶ 21; Doc. 95 (11 C 4870) at 5. The record contradicts Gray's assertion—the rejection notifications clearly indicate why each publication was rejected.  Doc. 35 (11 C 4870) at pp. 12-13 ("on the 'disapproved publication list,'" "penetration," "altered photos on lo[o]se pages, not allowed"), 15 ("The publication is listed on the Disapproved Publication List."), 17 (same), 19 (same), 26 ("altered, loose pages not allowed"), 28 ("penetration"), 32 ("penetration throughout"), 37 ("inappropriate photos"), 39 ("penetration advertisements … not allowed"), 43 ("Disapproved List"), 45 (same).  Thus, Gray was provided with enough notice of the grounds for rejecting his publications to enable him to

grieve the rejections before the materials were destroyed. *See Matamoros v. Grams*, 706 F.3d 783, 790 (7th Cir. 2013) ("The purpose of notice under the Due Process Clause is to allow an interested party to challenge the deprivation of a protected liberty interest before it occurs.").

Because Plaintiffs have failed to submit evidence sufficient to establish the factual predicate of their due process claim, Defendants are entitled to summary judgment on that claim.

## Conclusion

For the foregoing reasons, Defendants' motions for summary judgment are granted, and Gray's motion for summary judgment is denied.

July 16, 2013

_____
United States District Judge